IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CARLINA
COLUMBIA DIVISION

| | |
|---|---|
| MORTGAGE ASSURANCE, LLC, ) <br> and SAMMYE HUMBLE-HAMMOND, ) <br>   ) <br> Plaintiffs, ) <br>   ) <br> vs. ) <br>   ) <br> WACHOVIA CORPORATION, d/b/a ) <br> WACHOVIA BANK, N.A., ) <br>   ) <br> Defendant. ) <br> _____ ) | C.A. No. 3:05-824-CMC <br><br> OPINION AND ORDER <br> DENYING, IN PART, MOTION <br> TO COMPEL ARBITRATION <br> (remaining issues moot) |

This matter is before the court on Defendant's motion to compel arbitration pursuant to the Federal Arbitration Act, 9. U.S.C. § 1, *et seq.* ("FAA"). Plaintiffs oppose arbitration on four grounds. First, Plaintiffs assert that they are not bound by the arbitration provisions on which Defendant relies because the agreements containing the arbitration provisions were not delivered to them. Second, Plaintiffs assert that the agreements, even if binding, do not apply to their claims both because of the subject matter of the claims and because of the date on which some of the claims accrued. Third, Plaintiffs assert that the transactions in question do not involve interstate commerce, thus precluding application of the FAA. Finally, Plaintiffs assert that Defendant has waived any right to enforce the arbitration provisions as the motion to compel was not filed until fourteen months into litigation, after the parties had engaged in substantial discovery and incurred significant expenses that would not otherwise have been incurred.

For the reasons set forth in Defendant's memoranda, the court finds the FAA to apply to the claims in this action as they involve interstate commerce. Nonetheless, the court finds that the main substance of Plaintiffs' claims are beyond the scope of any binding arbitration provision for the

reasons set forth below. The court declines to decide whether Defendant has waived or defaulted on its right to enforce the arbitration provisions as to the remaining claim(s) based, in part, on a conclusion that Plaintiffs have abandoned any claims as to which waiver or default might serve as the sole basis for denying the motion to compel.

## BACKGROUND

**Parties.** Plaintiff Sammye Humble-Hammond ("Humble-Hammond") is the owner of Plaintiff Mortgage Assurance, LLC ("Mortgage Assurance"). Complaint ¶ 12. The latter is a limited liability corporation which, in October 2001, operated a business location at 7091 Rivers Avenue, North Charleston, South Carolina. Complaint ¶ 15. On October 11, 2001, Mortgage Assurance, through the actions of Humble-Hammond, opened a commercial checking account with Defendant Wachovia Bank ("Bank"). Complaint ¶ 16.

**Original Agreement.** The standard agreement in effect for commercial accounts in October 2001 did not contain an arbitration provision. It did, however, include the following provision which allowed for modification upon notice of any changes:

> All terms and conditions and any rules and regulations governing these accounts may be changed by the Bank at any time *upon notice to the depositor*. Any communication by the Bank to any depositor of a multiple party account shall constitute notice of the contents of such communication to each other depositor. Continued use of the account shall constitute acceptance of the changes to the terms and conditions.

Dkt No. 20 (Defendant's opening memorandum), Ex. A (document titled "Terms and Conditions Governing Your Deposit Account" and dated August 18, 2001, bates numbered W1435-43 at W1437 – emphasis added). Humble-Hammond and other agents of Mortgage Assurance signed documents acknowledging receipt of this document. Dkt No. 20, Ex B.

Signature cards prepared at the time the account was opened listed Humble-Hammond as owner and Raymond Barrineau as General Manager. Both of these individuals as well as a third individual were authorized to sign checks and take various other actions in relation to the account. The address shown on the initial signature/ownership cards indicated that materials were to be sent to the attention of Raymond Barrineau at a Rivers Avenue address.[1]

**Amended Agreements (Arbitration Provisions).** Some time in 2002, the bank began producing and distributing a document entitled "Deposit Agreement and Disclosures for Commercial Accounts" with an effective date of November 15, 2002 ("November 2002 Agreement"). Dkt No. 27 (Defendant's amended reply memorandum), Ex. A (Affidavit of Claxton Graham) & Ex. B (November 2002 Agreement). This document contained an arbitration provision which read, in relevant part, as follows:

> **ARBITRATION OF DISPUTES/WAIVER OF JURY TRIAL AND PARTICIPATION IN CLASS ACTIONS.** If either you or we request, any irresolvable dispute or claim concerning your account or your relationship with us will be decided by binding arbitration under the expedited procedures of the Commercial Financial Disputes Arbitration Rules of the American Arbitration Association (AAA), and Title 9 of the US Code. . . .
>
> To the extent permitted by law, a judge without a jury will decide any dispute or claim that is not submitted to binding arbitration that results in a lawsuit.
>
> * * *

---

[1] The address shown on this card is:

Mortgage Assurance of Charleston LLC
Attn Raymond Barrineau
6899 Rivers Ave
North Charleston, SC 29406

The complaint, however, indicates that the initial address was 7091 Rivers Avenue.

3

> YOU UNDERSTAND AND AGREE THAT YOU AND WE ARE WAIVING THE RIGHT TO A TRIAL BY JURY AND ARE WAIVING THE RIGHT TO PARTICIPATE OR BE REPRESENTED IN ANY CLASS ACTION LAWSUIT.

Dkt No. 27, Ex. B at W1484, ¶ 47.[2]

An officer in the Bank's Forms Management Department, Claxton Graham, has averred that when changes were made to the account agreements, the modified agreement was "provided to every commercial customer by mailing a copy of the modified or amended language of the Agreement to the address on file with the bank for that commercial customer." Dkt No. 27, Ex. A ¶ 3. Graham also averred that "changes to [Agreements] which are adverse to the customer are sent with prior notice before the effective date of those changes." Id. ¶ 4. No specific evidence has, however, been offered to support the conclusion that the November 2002 Agreement was, in fact, mailed to the address on file for Mortgage Assurance. Neither was the November 2002 Agreement mentioned in Defendant's opening memorandum. *Supra* n. 2.

In 2003, the Bank merged with another bank. In connection with that merger, various documents were mailed to existing customers. Affidavit of Jane Simons ¶ 6 (Dkt No. 27, Ex. D). Among the documents mailed was a document entitled "Commercial Deposit Account Agreement" which reflects an effective date of May 9, 2003 (May 2003 Agreement). *Id.* ¶ 6 & Ex. D-3 at p. 6, § I. The May 2003 Agreement contains an arbitration provision identical to that found in the November 2002 Agreement (quoted above). Dkt No. 27, Ex. D-3 at p. 26, ¶ 47.

---

[2] The Bank makes no mention of the November 2002 Agreement in its opening memorandum. Instead, it notes that the agreement which was in effect when the account was opened in October 2001, allowed for amendment and that an amendment to add an arbitration provision was made prior to the date the account was closed. The only agreement mentioned in the Bank's opening memorandum which contained an arbitration provision is an agreement which went into effect on January 1, 2004 ("January 2004 Agreement"). Defendant does not, however, address how or when this agreement was provided to Plaintiffs.

4

Jane Simons, who is currently employed as Vice President and Merger Communication Manager for the Bank, averred as follows regarding delivery of the May 2003 Agreement to Mortgage Assurance:

> Bank records indicate that this mailing was sent to Mortgage Assurance on March 10, 2003 by United States mail at the following address:
>
> > MORTGAGE ASSURANCE OF CHAS
> > Raymond Barrineau
> > 7091 RIVERS AVENUE
> > NORTH CHARLESTON, SC 29406-4623
>
> Wachovia Bank records indicate that this mailing was not returned to the Bank.

Dkt No. 27, Ex. D ¶ 6.[3]

The Bank asserts that it again amended the controlling agreement effective January 1, 2004, and that this January 2004 Agreement (the one relied on in the Bank's opening memorandum) was distributed to customers. Dkt No. 27, Ex. A (Graham Affidavit). The January 2004 Agreement also contained an identical arbitration provision. No specific evidence is, however, offered as to when or how this document was delivered to Mortgage Assurance or its agent(s).

**Wrongs Alleged.** In or before January 2003, Barrineau opened a separate account with the bank in the name of TayRay, Inc. Complaint ¶ 40. Beginning in January or February 2003, Barrineau began diverting checks which were made out to Mortgage Assurance to the TayRay, Inc., account by stamping them "For Deposit Only TayRay, Inc." Complaint ¶ 42. The checks, therefore,

---

[3] The address referenced is the address given by Plaintiffs as the proper address in the Complaint, although it varies slightly from the address shown on the initial address card. *See supra* n. 1. The court, therefore, assumes that the address was correct.

5

never passed through Mortgage Assurance's account.[4] This diversion of checks continued through May 28, 2004, and involved eighty-six checks totaling over $234,000. Complaint ¶ 46.[5]

In September 2003, Barrineau made changes to the Mortgage Assurance account. Specifically, he completed new signature cards which falsely listed himself as President of Mortgage Assurance and his sister-in-law as Secretary. Complaint ¶ 25 (further stating that the sister-in-law was never an employee of Mortgage Assurance). Humble-Hammond asserts that she was not contacted for approval and that the Bank had no supporting documentation which would have authorized Barrineau to make these changes. The changes made by Barrineau did not come to Humble-Hammond's attention until some later time.[6]

**History of Litigation.** Plaintiffs filed this action on March 17, 2005, asserting factual allegations as summarized above. Based on these allegations, Plaintiffs asserted four causes of action: (1) Breach of Contract; (2) Negligence; (3) Violation of the Uniform Commercial Code; and (4) Conversion. The present motion was filed fourteen months later. The following has occurred in the interim:

- the parties conducted a Rule 26(f) conference and submitted the report as required by federal and local rules (Dkt No. 8);

---

[4] Humble-Hammond asserts that she was not alerted to the diverted checks through the normal weekly reconciliation process because Barrineau did not include the underlying closings on the weekly report. Complaint ¶¶ 34-36.

[5] The actual number and value of diverted checks as revealed during discovery is apparently somewhat higher. *See* Dkt No. 23 at 1(asserting diversion of 109 checks totaling over $270,000).

[6] As a result of Barrineau's changes, Humble-Hammond was no longer listed as an owner or authorized signatory. She would, therefore, have received notice of Barrineau's changes if checks she signed were subsequently dishonored. She asserts, however, that she continued to write checks and that the Bank continued to honor them. Complaint ¶ 32.

- in its June 14, 2005 answers to Local Rule 26.01 Interrogatories (Dkt No. 7), Defendant acknowledged that the matter should be tried to a jury because "Plaintiffs have demanded a jury trial";

- in response to one of the inquiries required by local rule, the parties expressly "decline[d] to refer this matter to a magistrate judge or master," and acknowledged having discussed the availability and timing of mediation, but agreed that it would be premature to conduct mediation at this time;

- the parties engaged in discovery including receipt by Defendant of four sets of disclosures reflected on the court's docket -- Plaintiffs' three sets of responses to Local Rule interrogatories (Dkt No. 2, 6 & 13), and expert witness disclosure report (Dkt No. 12 – indicating completion of full expert witness report as required by Fed. R. Civ. P. 26(a)(2)) – as well as other discovery;[7]

- the parties twice jointly requested and received extensions of the time for discovery and other deadlines, each time assuring the court that they had been actively engaged in discovery;[8]

- on the day before the March 25, 2006 discovery deadline, the parties advised the court that the Bank intended to seek to compel arbitration (Dkt No. 18, consent motion to stay discovery pending motion to compel arbitration);

- Defendant asserts that the issue was first raised to Plaintiff earlier that same month during the depositions of bank employees (Dkt No. 27 at 11).

---

[7] Defendant acknowledges having also received responses to one set of interrogatories and having taken one deposition. Dkt No. 26 at 11. In addition, the court presumes that Defendant would have received the disclosures required by Fed. R. Civ. P. 26(a)(1).

[8] The first such request was filed on August 29, 2005, and sought additional time "[d]ue to the voluminous nature of the relevant documents in this case." The second request was filed on January 26, 2006. In this joint motion, the parties assured the court that they had been diligent in pursuing discovery, including by having "completed extensive written discovery and named expert witnesses in this matter." Dkt No. 16 ("Both Plaintiff [sic] and Defendant have actively pursued discovery in the matter. This matter involves a banking issue with numerous accounts containing relevant information to the litigation. The paper discovery process, which was timely begun by the parties, took much longer than expected due to the sheer volume of the material sought and the numerous accounts at issue."). Based on the above motions, the court extended the discovery deadline from November 25, 2005, as set forth in the original scheduling order, to January 24, 2006 (Dkt No 11, first amended scheduling order entered August 30, 2005), and then to March 25, 2006 (Dkt No. 17, second amended scheduling order entered January 30, 2006).

7

# DISCUSSION

### I.     Plaintiffs are bound only by the May 2003 Agreement.

As the moving party, the Bank bears the initial burden of establishing that Plaintiffs are bound by an agreement containing an arbitration provision. *See generally Wachovia Bank, N.A. v. Schmidt*, 445 F.3d 762, 767 (4th Cir. 2006) (noting purpose of FAA was "to place arbitration agreements upon the same footing as other contracts," thus the court's role is "to give effect to the intentions of the parties as expressed in their agreement"). As the Bank has conceded, the agreement in effect when the account was opened in October 2001, did not contain an arbitration provision. It did, however, reserve the Bank's right to modify the governing agreement, but only upon notice to the account holder. Thus, the Bank must establish that proper notice was provided of any amendment to the agreement on which the Bank seeks to rely.

The discussion in Graham's affidavit relating to distribution of the 2002 and 2004 Agreements consists only of generic statements as to how the Bank generally provided notice of changes. It is insufficient to support a finding that the 2002 and 2004 Agreements were, in fact, mailed or otherwise delivered to Mortgage Assurance. Thus, the Bank cannot rely on the arbitration provisions contained in these agreements.

The affidavit of Jane Simons, on the other hand, is specific as to when and how the May 2003 Agreement was provided to Mortgage Assurance, as Simons relies on Bank records which indicate that the notices were mailed to Barrineau's attention at the River Road address. In light of the designation of Barrineau as the general manager in the initial documents, and in the absence of any evidence that the documents were not, in fact, delivered to the address shown, the court finds this evidence sufficient to establish that Plaintiffs received notice of the May 2003 Agreement through

their designated agent.[9]  Plaintiffs do not dispute that they continued to utilize the account after the effective date of the May 2003 Agreement, thereby "accepting" changes of which Mortgage Assurance had received notice.[10]

For these reasons, the court concludes that the Bank has established notice to Plaintiffs (or at least Mortgage Assurance) of the May 2003 Agreement but not of any other agreement.  Plaintiffs are, therefore, subject to the arbitration provisions on and after May 1, 2003.

**II. Only some of plaintiffs' claims fall within the scope of the May 1, 2003 Agreement.**

The next question is which of Plaintiffs' claims fall within the scope of the arbitration provision found in the May 2003 Agreement.  As the Fourth Circuit has noted, whether a dispute is subject to arbitration is "primarily [an issue] of contract interpretation."  *Schmidt*, 445 F.3d at 767.  Nonetheless, "ambiguities regarding the scope of an arbitration clause . . . are to be resolved in favor of arbitration."  *Id.*  For example, if an arbitration provision purports to encompass "any claim or controversy arising out of, or relating to" a specific agreement, then the arbitration agreement "embraces every dispute between the parties having a *significant relationship* to the contract regardless of the label attached to the dispute."  *Id.* (emphasis added, internal citations and marks omitted).

---

[9] For these purposes, the court assumes that notice mailed to Mortgage Assurance at the River Road address and designated to the attention of Barrineau was sufficient because Barrineau was designated as general manager on the initial documentation for the account. The Bank also relies on Hubble-Hammond's deposition testimony for the proposition that Barrineau was the authorized agent. No portion of this deposition transcript has, however, been provided to the court. Moreover, a number of the references are to the deposition generally, rather than to specific pages. Such generic reference to a deposition is insufficient to draw the court's attention to the relevant passage, even when the deposition is provided.  The court has, nonetheless, assumed the relevant assertions to be true as they are neither inconsistent with other evidence in the record nor challenged by Plaintiffs.

[10] Plaintiffs' allegations relating to unauthorized changes to the account made in September 2003, confirm that the account remained active after May 2003.

In *Schmidt*, the Fourth Circuit found that an arbitration provision in a note did not reach a dispute between a bank and its customer relating to financial advice. This was both because the bank's role as financial advisor was distinct from its role as lender and because the financial advice at issue in the litigation was given prior to the execution of the note. Similar distinctions are present in this case as to some, but not all, of Plaintiffs' claims.

The arbitration provision in the May 2003 Agreement allows either side to request binding arbitration as to "any irresolvable dispute or claim *concerning your account or your relationship to us*." May 2003 Agreement, ¶47 (emphasis added). According to Plaintiffs' memorandum in opposition to the motion to compel arbitration, the essence of their claims is that Defendant wrongfully accepted checks which were made out to Plaintiff Mortgage Assurance, LLC, for deposit to an account held in the name of someone other than Mortgage Assurance. Neither the factual nor legal basis of any claims based on these allegations would be dependent on the existence of any contractual or other relationship between Plaintiffs and the Bank given that the claims would be the same if Mortgage Assurance had no account or other relationship with the Bank. These claims do not, therefore, have a "substantial relationship" to Plaintiffs' account or relationship with the Bank. Consequently, they are not subject to the arbitration provisions found in the May 2003 Agreement.[11]

Further, the first diversion was complete in February 2003, before the effective date of the May 2003 Agreement. Thus, at least some portion of Plaintiffs' injuries flow from events which occurred before that Agreement's May 1, 2003 effective date. To the extent Plaintiffs' claims are based on diversions of checks before May 1, 2003, they are, therefore, not subject to arbitration for

---

[11] The same would be true under the 2002 and 2004 Agreements as all three agreements contain identical language.

10

this additional reason.

The complaint does, however, allege one or more claims which fall within the scope of the arbitration provision in the May 2003 Agreement. Specifically, Plaintiffs have asserted a claim for breach of contract. Factually, this claim appears to be based on Barrineau's September 2003 changes to the signature cards on file with the bank, rather than on any allegation relating to his check conversion scheme. While it is not clear from the complaint, it is possible that some aspects of other legal theories may rest on the same factual allegations as the contract claim.

Any claim based on a contract theory which arose on or after May 1, 2003, must fall within the scope of the May 2003 Agreement as the account holder-bank relationship is the only contractual relationship alleged to have existed between the parties. Further, even if pursued under another theory, any claim which rests on allegations that the Bank violated a duty owed to Plaintiffs when it allowed Barrineau to make unauthorized changes to the signature cards would, necessarily, bear a substantial relationship to Mortgage Assurance's relationship with the bank as an account holder. As these allegedly wrongful events occurred in September 2003, after the May 2003 Agreement took effect, any claim based on these factual allegations would be subject to arbitration.

It appears, however, that Plaintiffs have abandoned pursuit of any such claims in this action. For example, in their memorandum in opposition to the motion to compel arbitration, Plaintiffs assert that the "crux" of this action relates to the Bank's complicity in Barrineau's conversion of checks. Dkt No. 23 (memorandum) at 1. Plaintiffs further argue that their

> claims . . . *do not involve the Mortgage Assurance account at all*. They also do not involve the banking relationship between Mortgage Assurance and Wachovia. The *only issue* is the deposit of 109 checks made payable to Mortgage Assurance into an account at Wachovia's bank that has no relationship with the Mortgage Assurance Account.

11

*Id.* at 8 (emphasis added). In light of these assertions and argument, the court concludes that Plaintiffs have abandoned any claim based on the contractual relationship between Mortgage Assurance and Wachovia or relating to Mortgage Assurance's status as an account holder.[12]

### III. It is unclear whether the Bank has waived its right to compel arbitration.

The FAA allows a party to demand a stay pending exercise of its contractual rights to have the subject matter of the federal action decided by arbitration "unless the party seeking arbitration is 'in default' of that right." *Maxum Founds., Inc. v. Salus Corp.,* 779 F.2d 974, 981 (4th Cir. 1985). "Default" is a concept similar to waiver, however, "the circumstances giving rise to a statutory default are limited and, in light of the federal policy favoring arbitration, are not to be lightly inferred." *Id.* Doubts as to whether the right to compel arbitration has been waived or defaulted should be resolved in favor of arbitration. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1 (1983). As the Fourth Circuit has explained:

> A party may waive its right to insist on arbitration if the party "so substantially utiliz[es] the litigation machinery that to subsequently permit arbitration would prejudice the party opposing the stay." *Maxum,* 779 F.2d at 981. But even in cases where the party seeking arbitration has invoked the "litigation machinery" to some degree, "[t]he dispositive question is whether the party objecting to the arbitration has suffered *actual prejudice*." *Fraser v. Merrill Lynch Pierce, Fenner & Smith, Inc.*, 817 F.2d 250, 252 (4th Cir. 1987) (emphasis added). "Neither delay nor the filing of pleadings by the party seeking a stay will suffice, without more, to establish waiver of arbitration. However, delay and the extent of the moving party's trial-oriented activity are material factors in assessing a plea of prejudice." *Id.*

*Microstrategy, Inc. v. Lauricia,* 268 F.3d 244, 249 (4th Cir. 2001) (also noting that the "party

---

[12] It is not clear what, if any, damages Plaintiffs suffered as a result of Barrineau's allegedly unauthorized changes to the signature cards. It does not appear that these changes were necessary to effectuate Barrineau's check-diversion scheme given that the diversion began four months before the changes to the signature cards were made.

12

opposing arbitration bears the heavy burden of proving waiver"–internal citation and marks omitted, emphasis in original).

In *MicroStratey,* the court concluded that the employer did not waive its right to compel arbitration of its employee's discrimination claims by filing three earlier actions against the employee. This was because "MicroStrategy's conduct in the prior actions . . .was in connection with its state-law claims which sought to prevent [the employee] from disclosing trade secrets or other confidential information." The court found these claims to be "distinct, both factually and legally, from [the employee's] discrimination claims . . . ." *Id.* at 250.

Whether a default or waiver has occurred in the present case presents two distinct and difficult questions. First, default or waiver may serve as a basis for denying enforcement of the arbitration agreement as to all claims. This would encompass an *additional ground* on which to deny enforcement of the arbitration agreement as to those claims which are beyond the scope of the arbitration provision as well as the *sole* ground on which to deny enforcement of the arbitration agreement as to those claims which fall within the scope of the agreement (claims related to Mortgage Assurance's account). Alternatively, default or waiver may be considered as the only basis on which to deny the motion to compel arbitration as to the latter category of claims (claims within the scope of the arbitration agreement).

Under the first scenario, the court would consider *all* prejudice flowing from the Bank's failure to seek arbitration at an earlier time. Under the second, the court would consider only the burdens resulting from the inclusion of the *additional* claims in this action, rather than pursuit of expedited arbitration proceedings as to these claims.

As the facts set forth in the Background section of this order indicate, the argument that Plaintiffs have been prejudiced by the Bank's delay is supported. *See supra* pp. 6-7 (discussing history of litigation). Whether the injury, parsed as indicated above, meets the high threshold required for a finding of waiver or default, however, remains a difficult question. It is, moreover, one which the court lacks adequate information to resolve.[13] In any event, resolution of this difficult issue appears to be unnecessary in light of Plaintiffs' abandonment of any claims or aspects of claims which might fall within the scope of the arbitration provision. Under these circumstances, the court declines to resolve the question of whether the Bank is in default or has waived the right to pursue arbitration.

## CONCLUSION

For the reasons set forth above, the court denies Defendant's motion to compel arbitration as to claims which rest on allegations that the Bank acted improperly in allowing Barrineau to deposit checks made out to Mortgage Assurance into the TayRay, Inc. account. The court further finds that Plaintiffs have abandoned pursuit, in this action, of any claim which relies on the existence of a contract or account holder-bank relationship between Mortgage Assurance and the Bank. The latter determination moots those aspects of the motion to compel arbitration which are not denied.

**FURTHER PROCEEDINGS.** Within ten calendar days of receipt of this order, the parties shall confer and submit a proposed amended scheduling order. Absent agreement to the contrary,

---

[13] Plaintiffs have failed to specifically address what benefits the Bank has gained and prejudice Plaintiff has suffered under either scenario. To resolve these questions the court would need to know: what discovery was performed by each party; the related fees and costs; whether the information discovered might be used in arbitration if arbitration was compelled; which party might benefit from the discovery; and whether the discovery would likely have been available in the arbitration proceeding.

the proposed schedule shall establish August 31, 2006, as the deadline for dispositive motions. Other deadlines shall follow in the same order and with the same general time frames between them as allowed in the last entered scheduling order.

    IT IS SO ORDERED.

                                            s/ Cameron McGowan Currie
                                            CAMERON MCGOWAN CURRIE
                                            UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
July 28, 2006